## CALDER RACE COURSE, INC., et al. v DIVISION OF PARI-MUTUEL WAGERING and DEPARTMENT OF BUSINESS REGULATION

Case No. 85-3199R

State of Florida, Division of Administrative Hearings

December 12, 1985

### APPEARANCES OF COUNSEL

**Wilbur E. Brewton** and **J. Riley Davis** for petitioners.

**Harry F. X. Purnell** for respondent.

**David S. Romanik** and **David M. Maloney** for intervenor Gulf Park Racing Association, Inc.

**Elizabeth J. DuFresne** for intervenor Florida Horsemen's Benevolent Association.

### OPINION

R. L CALEEN, JR., Hearing Officer.

### *FINAL ORDER*

This administrative challenge of Rule 7E-1.02(43), *Florida Administrative Code*, was heard on September 30, 1985, by R. L. Caleen, Jr.,

Hearing Officer with the Division of Administrative Hearings, in Miami, Florida. The parties were represented by counsel.

## ISSUE

Whether Rule 7E-1.02(43), *Florida Administrative Code*, a rule of the Division of Pari-Mutuel Wagering, Department of Business Regulation, constitutes an invalid exercise of delegated legislative authority.

## BACKGROUND

On September 19, 1985, pursuant to Section 120.56, *Florida Statutes*, Calder Race Course, Inc. ("CALDER"), and Tropical Park, Inc. ("TROPICAL"), referred to collectively as PETITIONERS, filed with the Division of Administrative Hearings a "Petition for Administrative Determination of the Invalidity of Rule 7E-1.02(43), Florida Administrative Code." This rule, promulgated by the Division of Pari-Mutuel Wagering, Department of Business Regulation ("DIVISION"), provides:

> (43) In the event of an emergency situation, after proper hearing before the Division of Pari-Mutuel Wagering, if it is determined to be in the best interest of thoroughbred racing in Florida that a track must close its stable and racing strip for a designated period of time, and the stabling facilities of the remaining tracks are sufficient to accommodate those horsemen wishing to race at one of the other tracks meeting, and that no serious detriment to the meeting success is evident, permission may be granted for such closing by the Division of Pari-Mutuel Wagering and the conditions set for same.

The parties moved to expedite and, by notice of September 25, 1985, hearing was set for September 30, 1985. At or prior to hearing, petitioners to intervene—in support of the rule—were filed by Gulfstream Park Racing Association, Inc. ("GULFSTREAM"), and the Florida Horsemen Benevolent Association ("FHBA"). At hearing, after PETITIONERS withdrew their opposition, and GULFSTREAM and FHBA were allowed to intervene as parties.

On September 27, 1985, pursuant to prior order, the PETITIONERS and the DIVISION executed a pre-hearing stipulation. GULFSTREAM and FHBA were also subject to the provisions of this document which stipulated to certain facts subject to later modification or clarification at hearing. In effect, and as explained at the outset of hearing, the facts (conditionally) agreed to in the pre-hearing stipulation were considered as admitted unless refuted or disproved by evidence presented at hearing.

The pre-hearing stipulation also included a general statement of the position of the PETITIONERS and the DIVISION:

## [PETITIONERS' POSITION]

Petitioners' position is that the challenged rule is an invalid exercise by the Division of delegated legislative authority in that said rule is not a reasonable implementation of Section 550.02 and Section 550.04, F.S.; and is, in fact, arbitrary, unreasonable and capricious, and amounts to legislating by an agency, which in and of itself, is unlawful. In addition, it is petitioner's [sic] position that said rule is an invalid exercise of delegated legislative authority in that said rule has not been applied in a uniform manner by the Division and, as such, is in direct violation of Section 550.02(3), F.S. Further, the rule is, in fact, void for vagueness.

The effect of the rule is to require a race track to keep its stables and racing strip open, at its own expense, for the benefit of competing race tracks. No race track, other than Calder Race Course, is being required by the Division to keep its stables open for the benefit of other race tracks. Further, no other race track in Florida has been required to keep its stables open for the benefit of other race tracks, nor has any other race track in Florida ever requested permission from the Division to close its stables and/or racing strip during the period of time that the race track is not operating. Instead, all other race tracks in Florida, other than Calder Race Course, open their stables and close their stables as the race track feels, in its business judgment, is necessary, for the successful operation of their own meet, although all race tracks keep their stables and racing strip open, of course, during their racing meet. The rule, on its face, would prohibit Calder from closing its racing strip and/or racing stables, no matter what the reason or justification, and regardless of the existence of a legitimate emergency if the closing of said stables would adversely affect the race meet of some other competing race track.

The rule, in effect, requires Calder to keep its stables open during the time it is not operating its racing meet, for the benefit of other competing race tracks, at its own expense. Neither the state, nor the other competing tracks who are deriving a benefit from the other track's open stables and racing strip, compensate Calder for the expenses incurred by that track in keeping the stables and racing strip open. As such, the rule is an unreasonable implementation of the statutes in question, and is arbitrary and capricious.

248

## [RESPONDENTS' POSITION]

Respondent maintains that the rule is a valid exercise of delegated legislative authority in that said rule is necessary for the preservation of state revenue and for the best interest of racing in the state, all to the benefit of the state and to the Pari-Mutuel Industry as a whole, and, as such, in [sic] a valid and reasonable implementation of the pertinent pari-mutuel statutes.

PETITIONERS presented the testimony of Robert Rosenberg, Director of the DIVISION; Douglas Donn, President of GULF-STREAM; and Kenneth Noe, President of CALDER and TROPICAL.

The DIVISION, GULFSTREAM, and FHBA presented the testimony of Douglas Donn; John T. Simmons, Chairman of the Board of FHBA; James M. Long, a licensed owner, trainer, and Director of the FHBA; and Frances McNamee, Secretary of the FHBA.

PETITIONERS' lettered Exhibits A, B, C, D, E, F, G, H, I, J, K,[1] L, M, N, O, P, Q, R, S, and T were received in evidence. GULF-STREAM'S numbered exhibits 1 through 5 were also received in evidence.

The transcript of hearing was filed on October 24, 1985. The parties filed proposed findings of fact by November 4, 1985. Rulings on the proposed findings are contained in the attached Appendix.

Based on the parties' pre-hearing stipulation and the evidence adduced at hearing, the following facts are determined:

## FINDINGS OF FACT

### I.

1. TROPICAL PARK holds a Winter Thoroughbred Horseracing permit issued pursuant to Sections 550.02, 550.04, 550.05 and 550.81, *Florida Statutes,* and operates a race course in Dade County, Florida.

2. GULFSTREAM and Hialeah, Inc. ("Hialeah"), are the other holders of Winter Thoroughbred Horseracing permits within a 35-mile radius of TROPICAL. *See,* Section 550.081(1), *Fla. Stat.* (1983). GULFSTREAM operates a race course in Broward County; Hialeah operates one in Dade County.

3. CALDER is the only holder of a *Summer* Thoroughbred Horseracing permit authorized by Sections 550.40 and 550.41, *Florida*

---

[1] Exhibit K, the deposition of Richard B. Burroughs, on which ruling was reserved, is not received in evidence.

*Statutes*. It owns and operates a racing facility in Dade County. TROPICAL, during its winter race meet, leases the CALDER facility. It has done so since 1972, when CALDER acquired TROPICAL and the two corporations, in light of Section 550.47, *Florida Statutes*, agreed to the lease arrangement.

4. ·TROPICAL, GULFSTREAM and Hialeah, as the only three winter permit-holders, each operate one of the three winter racing seasons defined in Section 550.081, *Florida Statutes*, and are prohibited by law from operating their racing meets at the same time. Winter racing dates are allocated by the Florida Pari-Mutuel Commission under the provisions of Sections 20.16(4) and 550.081, *Florida Statutes*.

5. Intervenor, FHBA, is a voluntary organization of over 1,500 owners and trainers of thoroughbred race horses. The majority of its members participate in year round racing in Florida. Many of its members stable their horses at CALDER and a majority of its members participate in the CALDER and TROPICAL racing meets.

6. Respondent DIVISION, a state agency created by Section 20.16(2), is charged with exercising regulatory authority over Florida's pari-mutuel wagering industry.

7. The Legislature has enacted strict controls over pari-mutuel wagering in general and horseracing in particular. *See*, Chapter 550, *Fla. Stat.* (1985). The Legislature established the DIVISION, invested it with broad powers necessary to regulate and supervise the industry, and directed it to:

> make rules and regulations for the control, supervision and direction of all applicants, permittees and licensees and for the holding, conducting and operating of all race tracks, race meets, and races held in this state; provided, such rules and regulations shall be uniform in their application and effect. . . .

Section 550.02(3), *Fla. Stat.* (1983).

8. Effective May 17, 1976, the DIVISION amended Rule 7E-1.02 by repealing the then existing 7E-1.02(43), and replacing it with "new" subparagraph (43), the rule which CALDER and TROPICAL now challenge. The "old" 7E-1.02(43), which had been in effect since the 1940s and, apparently, never challenged on legal grounds, reads as follows:

> All horse tracks within a radius of fifty (50) miles of each other shall

open their stables and racing strips by November 1 of each year and remain open until April 30 of the following year.[2]

"New" rule 7E-1.02(43) replaced this with the following:

In the event of an emergency situation, after proper hearing before the Division of Pari-Mutuel Wagering, if it is determined to be in the best interest of thoroughbred racing in Florida that a track must close its stable and racing strip for a designated period of time, and the stabling facilities of the remaining tracks are sufficient to accommodate those horsemen wishing to race at one of the other tracks meeting, and that no serious detriment to the meeting success is evident, permission may be granted for such closing by the Division of Pari-Mutuel Wagering and the conditions set for same.

9. When the DIVISION repealed "old" Rule 7E-1.02(43) and adopted "new" Rule 7E-1.02(43), it filed a summary and justification of the rule with the Department of State as required by Chapter 120, *Florida Statutes*. The summary states:

This rule provides a method for a track to repair racing strip and insures adequate stabling and training facilities during repairs.

The justification states:

This rule change is to coordinate the closing of any racing stable to insure adequate stabling of horses so that there would be no detrimental effect on any other track.

(Petitioner's Exhibit "E")

10. When "old" Rule 7E-1.02(43) was amended in 1976 to its present form, the DIVISION proposed to adopt not only the rule as it now exists, but also the following language:

All horse tracks within a radius of fifty (50) miles of each other shall open their stables and racing strips by October 1 of each year and remain open until ten (10) days beyond the closing date of the track operating the last period of the winter racing season. The horse track running the first period of the winter racing season shall reimburse the track running the middle and last period for fifty (50) percent of the additional operating expenses caused solely by the opening of these tracks 30 days earlier than prior existing rule.

The DIVISION, however—for reasons not explained in the record—did not adopt this provision.

---

[2] When "old" Rule 7E-1.02(43) was in effect, there were only three horse tracks in Florida located within a radius of 50 miles of each other. These tracks, located in Dade and Broward Counties, were the three winter thoroughbred permittees: GULF-STREAM, Hialeah, and TROPICAL.

11. With the repeal "old" Rule 7E-1.02(43) and the DIVISION'S failure to adopt, in connection with "new" Rule 7E-1.02(43), the proposed language (requiring that certain stables and racing strips be open during a specified time period without regard to the particular track's racing season) there was no longer a rule explicitly compelling any race track to open its racing strip and stables in advance of, or keep them open after the close of, its allotted racing season.

12. In October, 1976, the DIVISION, apparently mindful of this hiatus, proposed to adopt a rule requiring all thoroughbred race tracks (within 50-miles of each other) to open their stables and race strips by November 1, of each year and remain open until ten days beyond the closing date of the track operating the last period of the winter racing season. This proposal, similar to the provision inexplicably omitted when "new" Rule was adopted in April 1976, would have applied to TROPICAL, GULFSTREAM, and Hialeah—the three horse tracks within 50 miles of each other which conducted winter racing meets.

13. On October 15, 1976, pursuant to a request filed by CALDER and TROPICAL, the Acting Director of the DIVISION conducted a public hearing on the proposed rule. During the hearing, counsel for CALDER and TROPICAL argued that the CALDER/TROPICAL facilities needed to close in order to make necessary repairs; that the DIVISION lacked legal authority to adopt a rule compelling a race track to open its facilities and stables prior to and after the close of its own racing season for the purpose of accommodating other race tracks in the area; and that decisions on such matters should be made by management based on business judgment and the spirit of mutual cooperation. He added:

> Every year, the same general factors come to being at subsequent times, so all we are saying is to let the management sit down and work out and present a plan back to you, so the state can be assured of their cooperation. I believe that under those circumstances, that you will be pleasantly surprised at the ability of the tracks to cooperate and come up with a reasonable compromise.

(Petitioners' Exhibit D, p. 74)

The corporate president of GULFSTREAM, urging adoption of the rule, responded:

> I want to respond just the opposite. I feel you should pass this proposed rule or what I understand it to be. I still think we need the rule. *The only reason there is no rule now is there was a mistake made procedurally. That should not affect the fact it is a rule which is not on the books now.* In my opinion it should be on the books

252

now and should always be on the books. It is a mistake, but how you operate, I am not familiar with that. I hope we can compromise. *I do not think the state should be left in the position with no rule at all* and just on our talk here today that something is going to happen and you will assume that we will end up with a compromise. *It would not be beneficial to find in February or January that everybody is shutting down and opening up and trying to cut each other's throats. It could very well happen if this things gets out of hand.* (e.s.)

(Petitioner's Exhibit D, pp. 74-75)

Whether the DIVISION had legal authority to adopt the proposed rule, was the focus of some discussion at the public hearing. A day earlier, on October 14, 1976, Robert L. Shevin, then Attorney General of Florida, issued a formal four-page opinion that DIVISION was without authority to adopt the proposed rule. Citing, *Department of Business Regulation v. Vandervort*, 273 So.2d 66 (Fla. 1973) and *St. Petersburg Kennel Club v. Baldwin*, 38 So.2d 436 (Fla. 1979), he found that the proposed rule would violate the statutory requirement of Section 550.02: that all rules of the DIVISION be uniform in application and effect:

> The horse racing season will commence with Tropical at Calder opening around November 13 to be succeeded by Gulfstream and Hialeah. Calder will commence its summer horseracing season on or about May 13 and close on or about November 10. The effect of the rule will have all three tracks open November 1 and remain open to on or about May 21. Calder would, of course, be the only track required to remain open the entire year. That track is effectively prevented from ever closing its facilities to even be able to rebuild or take other necessary steps to ensure the safety of the attending public. . . .

(Petitioner's Exhibit G, p. 4)

He concluded the opinion with this summary:

> Absent subsequent judicial or legislative clarification, a rule proposed by the Division of Pari-Mutuel Wagering to require all horse tracks within a 50 mile radius to open their stables and racing strips by November 1 and to remain open until ten days beyond the closing of the winter racing season, would appear to violate the necessary statutory authority requirements judicially expressed by the Florida courts.

(Petitioner's Exhibit G, p. 4)

14. The DIVISION employee, attending the hearing to give reasons for the proposed rule, did not understand why the DIVISION'S legal authority for the rule was being questioned:

I would like to ask Mr. Moore [counsel for the DIVISION] a question. I do not have legal background. I thought that all of our rules are in the book, and the rule here was previously in the book, about the opening and closing of the winter tracks. I do not have the rule number. We know what we are talking about. The rules come from Florida Statutes or law. That is where the rules come from. *Where along the line did we lose our authority.* The mere fact that we are trying to change a rule and what not, does not mean that we do not have the authority. *I do not understand where we lost our authority to make the rules.*

(Petitioner's Exhibit D, p. 77)

15. The public hearing was adjourned, with the Division Director deferring his decision for ten days to give the parties an opportunity to present any additional information. There is no evidence that the DIVISION even took any further action on the proposed rule. No rule was adopted which expressly, as by necessary implication, re-imposed the former requirement—in effect from the 1940s until the April 1976 —which required race tracks to open their stables and racing strips in advance of their racing seasons, and keep them open beyond the close of their seasons.

## II.

16. Since the 1976 repeal and adoption of "new" Rule 7E-1.02(43), the DIVISION has never applied the rule to any other race tracks in Florida other than CALDER and its winter season lessee, TROPICAL. No other race track, other than CALDER/TROPICAL has ever requested permission from the DIVISION to close its stables at any time. Nor has the DIVISION ever taken any action against any track —other than CALDER/TROPICAL—demanding that stables remain open or demanding that permission from the DIVISION be obtained before closing them.

17. In January 1980, pursuant to Rule 7E-1.02(43), CALDER applied to the DIVISION—under protest—for permission to temporarily close its stables for necessary repairs during a specific period during the Winter Thoroughbred Horseracing season. The DIVISION, after hearing, granted permission.

18. Because the CALDER facility is operated during a summer season (June to November 9) and TROPICAL'S winter season (No-

254

vember 11 to January 7) and because Hialeah and GULFSTREAM operate their race meets during the period of time that the CALDER racing facility is not being used [January 8 to May 30] CALDER'S is the only horse race track required—under the DIVISION'S construction of Rule 7E-1.02(43)—to keep its stables and race strip open, unless permission is granted to close in accordance with the conditions specified in the rule. No other horse race track in Florida, including GULFSTREAM and Hialeah, is required to keep its stables and racing strips open year round, absent permission to close being granted by the DIVISION. Both Hialeah and GULFSTREAM open and close their stable areas in accordance with their business judgment. GULF-STREAM and Hialeah have never sought permission from the DIVISION to close their stable areas, nor as the DIVISION ever demanded that either keep their stables open year round, or during the period of time that both tracks are not conducting their individual racing meets.

19. By notice dated July 29, 1985, Kenneth Noe, Jr., President of TROPICAL and CALDER, notified all horsemen stabled at the CALDER/TROPICAL facility that the barn area would close on Monday, January 13, 1986, for necessary improvements and repairs. He stated that the cost of keeping the stables open for the horsemen's benefit during the time that CALDER and TROPICAL were *not* operating race meets was getting "most prohibitive". This notice precipitated a letter dated August 2, 1985, from Richard Burroughs, Jr., Secretary and Head of the Department of Business Regulation, advising Mr. Noe, that CALDER could not close its facility at the conclusion of TROPICAL'S winter race meet without first complying with the conditions of Rule 7E-1.02(43). (Petitioner's Exhibit K.)

20. Mr. Burroughs was unaware of the existence of Rule 7E-1.02(43) until after he learned of CALDER'S intent to close its racing facility in January 1986, and sought advice from the DIVISION'S legal counsel on the DIVISION'S responsibilities. Mr. Burroughs is still not familiar with the rule, other than the fact that he has been advised by counsel that such a rule exists, and that it requires the CALDER stable area to remain open unless the DIVISION grants permission to close. It is his stated intention to enforce Rule 7E-1.02(43), or ask his legal staff to enforce the rule if he feels enforcement is "in the best interest of the State of Florida, the best interest of the thoroughbred racing industry in Florida, and the best interest to protect the State's revenue." (Petitioner's Exhibit K, p. 13)

21. By letter dated August 23, 1985, addressed to Mr. Burroughs, CALDER specifically objected to the application of Rule 7E1.02(43) to its facility for several reasons, including:

255

(1) If such rule is valid, it can only apply during a permit-holder's meet, as a [sic] jurisdiction of the Division over such permit-holders facilities extends to the conduct of its meet, and not beyond.

(2) If the rule is applied to extend beyond the permit-holder's meet, then such rule requires the use of Calder's private property for the benefit of the State, or some other private permit-holder without compensation to Calder, the same being in violation of the Florida Constitution.

(3) The rule, since enactment in 1976, has never been applied to any permit-holder. The Division has never utilized or exercised any authority relating to the opening or closing of any permit-holder's stable area or racing facility.

(4) The rule in and of itself is vague, and the history of the enactment of the same, indicates clearly that the Division had recognized the lack of power to require stables to stay open for the period of previous rule 7E-1.02(43).

(Petitioner's Exhibit I)

22. The rule, as construed by the DIVISION, requires a race track to keep its stable area open for the benefit of horsemen wishing to race at *another* race track, even though the race track whose stables are to remain open is not presently conducting its race meet. Under this construction, a horse race track must keep its stables open for the benefit of other race tracks, with no compensation from the affected race track. In the Division's view, such a requirement is necessary for the good of the pari-mutuel industry because a sufficient supply of stables is necessary to attract quality horses to Florida horse races. However, in practice and application, *only* CALDER is required to keep its stable area open year round, and it is the only race track in the state required to request permission to close its stables.[3]

23. The current Director of the DIVISION does not know what various provisions of Rule 7E-1.02(43) mean or were intended to mean, and is unable to construe the rule or apply it. He think, however, that it means that while either GULFSTREAM or Hialeah is operating, TROPICAL is obligated (to these winter thoroughbred permit-holders) to maintain its backside open; similarly Hialeah and GULFSTREAM are obligated to open while TROPICAL is operating. He is not sure, however, whether Hialeah and GULFSTREAM have ever complied

---

[3] GULFSTREAM, for example, plans to close its stable area on or before May 1, 1986, at the conclusion of its winter racing season. Its stall application notifies horsemen of this fact. (Petitioner's Exhibit M)

with the rule. Neither Hialeah nor GULFSTREAM has ever requested permission to close their stables. There have been occasions, however, when Hialeah and GULFSTREAM may have opened or closed a little before the season, or opened a little bit later than the DIVISION thought they should; when this occurred the DIVISION discussed the matter with them. However, no other DIVISION action was taken towards GULFSTREAM or Hialeah under the rule. The Division Director was aware that Hialeah opened its stables late in 1984, somewhere near the end of November, when only about 35 racing days were left in TROPICAL'S race meet. (Testimony of Rosenberg)

## III.

24. The CALDER race facility has approximately 1,850 stables; GULFSTREAM and Hialeah each have approximately 1,300 stables. During both CALDER'S and TROPICAL'S race meet, all of the horses stabled at CALDER'S stabling area, except for approximately 10 to 15 percent, actually run in a CALDER or TROPICAL race. In 1984-85, the horses stabled at Hialeah during its race meet, only 50 percent of the horses actually ran in a Hialeah race. Of the horses stabled in GULFSTREAM'S barns during its meet, only 75 percent of the horses actually ran in a GULFSTREAM race. Almost 40 percent of the horses stabled at GULFSTREAM and Hialeah—1,016 horses out of 2,600—failed to run in a race at either.

25. The DIVISION has never conducted a specific study as to the expense incurred by the race tracks in keeping their stables open during the period of time they are not operating, or when they are conducting a race meet. Nor has the DIVISION conducted a specific study on the number of stables needed by any affected race track to conduct a successful race meet.

26. CALDER has a sufficient number of stables at its facility to operate its 120 day summer racing meet, or any one of the periods of winter racing. The cost of operating the stable area and racing strip at CALDER is approximately $8,000 per calendar day. (Horsemen are not charged for use of the stables at any of the affected race tracks.)

27. If Hialeah and GULFSTREAM were to allocate their stable space to horses that would actually run during their race meets, both Hialeah and GULFSTREAM should have sufficient stable space. However, the management of GULFSTREAM feels that in order to attract the quality of horses necessary for a successful race meet, it must provide stable space to other horses which it knows will not run at its race meet. The decision on which horses will be allowed to stable

**257**

at the respective race tracks, and how many stables will be assigned to horses which will not actually run a race, is made by management.

28. 1984-85 "starter books" show that 1,016 horses stabled at Hialeah and GULFSTREAM during their meets did not run in a race at either. However, during GULFSTREAM'S 1984-85 meet, 874 horses were stabled at CALDER but ran in a race at GULFSTREAM. Likewise, during Hialeah's 1984-85 race meet, approximately 418 horses were stabled at CALDER but ran in a race at Hialeah. Thus during the Hialeah and GULFSTREAM race meets, approximately 1,292 horses were stabled at CALDER, but started a race at either Hialeah or GULFSTREAM. Hialeah and GULFSTREAM, however, did not start a total of 1,016 horses stalled at their own facilities. Subtracting the 1,016 figure from the 1,292 figures leaves a total of 276 as the maximum number of stalls that might have been necessary to accommodate horse trainers intending to race at a horse race meet. However, if GULFSTREAM and Hialeah were to allocate their stall space only to horse trainers intending to run at their respective track facilities, both Hialeah and GULFSTREAM would have sufficient stall space.

29. GULFSTREAM did not build more than 1,300 stalls because many of the horses that were going to *run* at its race track were stabled at the former TROPICAL racing facility, and after 1972 (when TROPICAL leased the CALDER facility), at the CALDER racing facility. Consequently, there was no reason for GULFSTREAM to build additional stables (as CALDER did) because it used CALDER stables in connection with the operation of its race meet. However, nothing under the pari-mutuel laws and rules would prohibit GULF-STREAM from building additional stable space at its facility, should it feel such action is warranted. (GULFSTREAM has not added a new stable in 15 years.)

30. For several years, GULFSTREAM has come to rely on the availability of CALDER'S stables and racing strip to augment its own stables during the operation of its racing meet. With CALDER'S stables available to it, GULFSTREAM could allocate numerous stables and stalls to horsemen who were bringing horses to GULFSTREAM which GULFSTREAM knew would not run in its meet.

31. GULFSTREAM'S stated reason for its stable management practice is that such allocation of stalls is necessary in order to attract better horses to its race meet. Mr. Donn, GULFSTREAM'S corporate president, explained it in this way:

Q. [By Mr. Brewton] You made several comments relating to

258

different trainers and so forth that you were discussing, and I don't recall who in particular, but you made comments relating to people bringing down certain prize horses, then the statement, are we to deny stalls to those people?

A. [By Mr. Donn] Right.

Q. We must offer that luxury?

A. Right.

Q. It's worth it if we get that horse?

A. Right.

Q. We have to accept other horses in order to get prime horses?

A. Un huh. Sometimes.

Q. It's worth it to see those horses run?

A. It's worth it to Florida racing.

Q. Is that the statements you made?

A. Right.

Q. Is that not a management decision you have made by Gulfstream Park, in your references to your business?

A. It's a management decision that has been made at most other tracks in the country. If you got a prize horse, you write your ticket and that's the nature of the beast.

Q. But that's management decisions you have made as to whether or not you have to do it?

A. It's a management decision that he wants to increase the quality and quantity of racing.

Q. At your race meet?

A. Right.

(Transcript of Hearing, pp. 230-231.)

In effect, CALDER must keep its stables open in order to (in light of GULFSTREAM'S stall allocation practice) assure adequate stables for the conduct of GULFSTREAM'S meet. This requires CALDER and TROPICAL to bear the expense of keeping CALDER'S stables open for the sole benefit of GULFSTREAM, whose need for CALDER'S stables is created by its own stall allocation decisions; CALDER is vitally affected by those decisions but plays no part in them.

## CONCLUSIONS OF LAW

1. The Division of Administrative Hearings has jurisdiction over the

parties and subject matter of this proceeding. Section 56, *Florida Statutes* (Supp. 1983).

2. PETITIONERS are "substantially affected" by Rule 7E-1.02(43) and have standing to challenge its validity. Similarly, the Intervenors have standing since they would be "substantially affected" by a determination of its invalidity. Section 120.56(1), *Florida Statutes* (1983)

3. A rule must be invalidated it is shown that:

(1) the agency adopting the rule has exceeded its authority, (2) the requirements of the rule are not appropriate to the ends specified in the legislative act, and (3) that requirements contained in the rule are not reasonably related to the purpose of the enabling legislation, but are arbitrary or capricious.

*Agrico Chemical Co. v. State, Department of Environmental Regulation*, 365 So.2d 759 (Fla. 1st DCA 1979); *Department of Administration, Division of Retirement v. Albanese*, 445 So.2d 639 (Fla. 1st DCA 1984); *Department of Professional Regulation, Board of Professional Engineers v. Florida Society of Professional Land Surveyors*, 10 FLW 2081 (Fla. 1st DCA September 4, 1985).

4. In *Florida Power & Light Co. v. Florida Public Service Commission*, 471 So.2d 526, 528 (Fla. 1985), the Florida Supreme Court recognized the fundamental limitations an agency rulemaking power:

It is a cornerstone of administrative law that administrative bodies or commissions, unless specifically created in the constitution, are creates of statute and derive only the power specified therein. (Citations omitted]

\* \* \*

As such they have no inherent power to promulgate rules, but must derive that power from a statutory base. . . .

As stated in 1 Fla. Jur. 2d, Admin. Law, Section 48:

The rule making power which the legislature may validly delegate to administrative agencies, must be and is limited by the statute conferring the power. Administrative agencies, when empowered to do so, may make and enforce regulations to carry out powers definitely conferred on them, but they are not permitted to do more. The legislature cannot clothe them with more and neither may they assume to do more. While an administrative agency may regulate, it may not legislate, unless so authorized by the constitution. Its powers to adopt rules and regulations is limited to the yardstick laid down by the legislature. Moreover, the rules and regulations enacted by administrative agencies must be reasonable.

An administrative rule cannot enlarge, modify, or contravene the provisions of a statute. *Seitz v. Duval County School Board*, 366 So.2d 119, 121 (Fla. 1st DCA 1979); *State Department of Health and Rehabilitative Services v. McTigue*, 387 SO.2d 454 (Fla. 1st DCA 1980). A rule which attempts to do so is invalid. *Nicholas v. Wainwright*, 152 So.2d 458, 460 (Fla. 1963); *State Department of Business Regulation, Division of Alcoholic Beverages and Tobacco v. Salvation Limited, Inc..*, 452 So.2d 65 (Fla. 1st DCA 1984). The rule must be reasonable with reference to all rights materially affected by it and must be appropriate in the method and extent of its application. 1 Fla. Jur. 2d *Admin. Law*, Section 95; *McTigue, supra.*

It is also fundamental that the necessity for, or desirability of a rule does not, of itself, supply authority to promulgate it. *4245 Corporation v. Division of Beverage*, 371 So.2d 1032 (Fla. 1st DCA 1978); *McTigue, supra.*

5. In adopting Rule 7E-1.02(43), the DIVISION referenced Section 550.02(3), *Florida Statutes*, as general statutory authority for the rule, and Sections 550.02 and 550.04 as the laws being implemented. Section 550.02(3), *Florida Statutes*, provides:

The Division shall make rules and regulations for the control, supervision, and direction of all applicants, permittees, and licensees, and for the holding, conducting, and operating of all race tracks, race meets, and races held in this state, *provided such rules and regulations shall be uniform in their application and effect,* and the duty of exercising this control and power is made mandatory upon the Division. . . . (e.s.)

Examination of the laws which the challenged rule purports to implement reveals that they relate to the *actual conduct and operation of race tracks during a race meet.* There is no specific reference to horse stables; nor a requirement that stables on the grounds of a race track remain open prior to or after the conducting of a race meet. Indeed, Chapter 550, *Florida Statutes* (1983), is silent on the subject.

Chapter 550, *Florida Statutes*, reflects a regulatory scheme relating solely to the operation of race tracks during their race meets and to the conduct of licensees during race meets. All DIVISION permits granted to conduct race meets require that they be conducted during the time and at the location fixed by the Pari-Mutuel Commission. It is only during this specified time that the thoroughbred horse track is authorized to conduct horse racing, where bets or wagers are placed on the outcome of the race. The periods of racing are restricted as specified by statute. *See*, Sections 550.011, 550.03, 550.04, 550.031, 550.05, 550.07,

550.08, 550.081, 550.41, 550.45, and 550.4904, *Florida Statutes* (1983). The statute speaks to the periods of time that race tracks are allowed to conduct horse racing where wagers are permitted, and specifically regulates the horse race track during the time that it is operating under to the terms of its license.

Under such circumstances, Sections 550.02 and 550.04 and 550.02, *Florida Statutes,* do not supply the necessary statutory authority for the challenged rule, which is construed as requiring a race track, during the period of time that it is not operating under its license, to keep its stables and racing strip open—at its own expense—for the benefit of another race track. The rule exceeds and attempts to enlarge the DIVISION'S authority delegated by Section 550.02.

In *Department of Business Regulation v. Vandervort,* 273 So.2d 67 (Fla. 1973), the DIVISION had promulgated a minimum jockey fee schedule for the payment of jockeys by race tracks if the tracks had not entered into specific contracts for compensating the jockeys. The DIVISION relied on Section 550.02(3), *Florida Statutes* (then Section 550.02(4)), for its authority. The court struck the rule as an invalid exercise of delegated legislative authority since the legislature had not specifically authorized the setting of jockey fees, and a rule setting such fees was simply too broad a power to be derived from the provisions of Section 550.02(3), *Florida Statutes.* Similarly, the rule at issue here which (as construed) requires one race track, at its own expense, to keep its stables open for the benefit of another race track, and effectively appropriates one race track's property for the use and benefit of another, is too broad a power to be derived from Section 550.02(3), *Florida Statutes* (1983). This is so even if it ostensibly benefits the south Florida thoroughbred industry.

6. Further, Rule 7E-1.02(43) is unreasonable, arbitrary, and capricious because of the condition it places on the grant of permission to close. The rule provides:

> In the event of an *emergency situation,* after proper hearing before the Division of Pari-Mutuel Wagering, *if it is determined to be in the best interest of thoroughbred racing* in Florida that a track must close its stables and racing strips for a designated period of time, *and* the *stabling facilities of the remaining tracks* are sufficient to accommodate those horsemen wishing to race at one of the other tracks meeting, *and* that no serious detriment to the meeting success is evident, permission *may be* granted for such closing by the Division of Pari-Mutuel Wagering and the conditions set for same. (e.s.)

The rule establishes four prerequisites to the granting of permission

262

to close a track's stables: (1) an emergency situation must exist; (2) closure must be in the best interest of thoroughbred racing; (3) the stabling facilities of other tracks conducting a race meet must be sufficient to accommodate those horsemen wishing to race at them; and (4) closure will not cause a serious detriment to the meeting success of another race track. Thus, one race track can force denial of permission to close, and effectively compel another race track to keep its stables open, by allocating, as does GULFSTREAM, a significant number of its stalls to horses which do not race at its own race meet.

Further, the rule is unreasonable, arbitrary, and capricious with reference to the rights of persons materially affected by it and is appropriate in the method and extent of its application. In operation, it requires CALDER to keep its stables open all year for the benefit of others. Under this rule, no other race track has been required (for the benefit of other tracks) to open its stables before or keep them open after the close of its racing season.

The DIVISION is using the challenged rule to require CALDER to keep its stables open, at its own expense, for the benefit of other pari-mutuel permit-holders and, as ostensibly, the horse racing industry in Florida. The permit-holder receiving the primary benefit, GULF-STREAM, could accommodate the horses necessary for its race meet by either building additional stables or by allocating its stall space more discriminately i.e., primarily to horses that will race during its race meet. The rule, as construed, unreasonably, arbitrarily, and capriciously requires CALDER to keep its facilities open at a cost of $8,000 per day for the primary benefit of GULFSTREAM. The DIVISION has conducted no studies concerning the number of stables needed by each race track to conduct a successful race meet; no studies to determine the need of race tracks to stable numerous horses that will not race at the track in order to attract quality horses; and no studies to determine whether a horse meet could succeed without stabling so many horses that will not run at the meet.

6. Furthermore, Section 550.02(3) expressly requires that all DIVISION rules be uniform in their operation and effect. Rule 7E-1.02(43) does not meet this statutory requirement. It has not been and is not being applied uniformly. Only CALDER has been required to keep its stables open beyond its race meet and only CALDER has been required to obtain DIVISION permission (under the challenged rule) to close its stables. Since the rule, in its practical application, is not applied uniformity, it is invalid. *See, St. Petersburg Kennel Club v. Baldwin*, 38 So.2d 436 (Fla. 1949).

7. Indeed, the explicit long-standing requirement that race tracks

**263**

keep their stables open during a specified period after their meets was, inexplicably repealed in May 1976; a similar provision—re-imposing this requirement—was proposed but never adopted. In October 1976, the DIVISION proposed to correct the apparent omission (or mistake) by adopting a rule explicitly re-imposing the requirement. After a public hearing, where its authority to do so was questioned, it declined to act. In the ensuing years, CALDER kept its stables open by choice. The rule—which provides a mechanism for closing stables—is now being unreasonably and selectively used as authority for compelling CALDER to keep its stables open.

Accordingly, based on the foregoing, it is

ORDERED:

That Rule 7E-1.02(43), *Florida Administrative Code*, constitutes an invalid exercise of delegated legislative authority.

DONE and ORDERED this 12th day of December, 1985, in Tallahassee, Florida.